**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JACKIE ROCHELLE JASHUREK,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 1:24-CV-02217-PAG<br><br>DISTRICT JUDGE PATRICIA A. GAUGHAN<br><br>MAGISTRATE JUDGE AMANDA M. KNAPP<br><br>**REPORT AND RECOMMENDATION** |

Plaintiff Jackie Rochelle Jashurek ("Plaintiff" or "Ms. Jashurek") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **REMAND** this matter pursuant to sentence six of § 405(g) for further proceedings and consideration of new evidence, and administratively close the case subject to reopening upon motion of the parties.

## I.     Procedural History

On January 3, 2022, Ms. Jashurek filed an application for DIB, alleging a disability onset date of December 12, 2021.  (Tr. 65.)  She alleged disability due to blind or low vision, epilepsy, hereditary angioedema ("HAE"), hypertension, anxiety, sleep apnea, and gastroesophageal reflux disease ("GERD").  (*Id.*)  Ms. Jashurek's application was denied at the initial level (Tr. 73) and upon reconsideration (Tr. 82), and she requested a hearing (Tr. 94).  On June 14, 2023, she

1

appeared pro se at a telephonic hearing before an Administrative Law Judge ("ALJ").  (Tr. 43-64.)  On August 8, 2023, the ALJ issued a decision, finding Ms. Jashurek has not been under a disability within the meaning of the Social Security Act from December 12, 2021, through the date of the decision.  (Tr. 21-37.)  On October 9, 2023, through counsel, Ms. Jashurek sought review of the decision by the Appeals Council, arguing that "[t]he ALJ failed to gather several pieces of missing material evidence on behalf of this pro se claimant."  (Tr. 2, 126-27, 224.)  On October 18, 2024, the Appeals Council found no reason to review the decision, making the August 8, 2023 decision the final decision of the Commissioner.  (Tr. 1-7.)

On December 19, 2024, Ms. Jashurek filed a Complaint challenging the Commissioner's final decision denying her social security disability benefits.  (ECF Doc. 1.)  The matter is fully briefed.  (ECF Docs. 7, 9, 10, 11-1.)[1]

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Jashurek was born in 1975 and was 46 years old on the alleged disability onset date, making her a younger individual under Social Security regulations on the alleged onset date. (Tr. 65.)  She has a GED.  (Tr. 171.)  Ms. Jashurek has not worked since December 12, 2021, the alleged onset date.  (Tr. 65.)

### B.    Medical Evidence

The ALJ found that Ms. Jashurek had several severe impairments, including epilepsy, HAE, hypertension, and sleep apnea (Tr. 27), but Ms. Jashurek only challenges the ALJ's

---

[1] After briefing was completed, Plaintiff submitted an unopposed motion to file an amended brief on the merits with correct citations to her additional evidence.  (ECF Doc. 11.)  The undersigned having granted the motion, the amended brief (ECF Doc. 11-1) will be referenced when citing to Plaintiff's merits brief (original at ECF Doc. 7).

findings related to her epilepsy (ECF Doc. 11-1).  The records summarized herein will therefore be limited to the medical evidence related to Ms. Jashurek's epilepsy.

  1.  **Relevant Treatment History**

    i.  **Records Submitted Prior to August 2023 ALJ Decision**

On March 17, 2021, Ms. Jashurek presented to Preetha Muthusamy, M.D., at Cleveland Clinic Ashtabula Medical Center Neurology as a new patient for treatment of seizures.  (Tr. 275-80.)  She said she first experienced a seizure in August 2020 and had another in September 2020.  (Tr. 275.)  The September 2020 seizure was unprovoked and involved eye rolling, generalized shaking, falling to the floor, tongue biting, urinary incontinence, and losing consciousness for over five minutes.  (*Id.*)  Ms. Jashurek was taking Keppra 500 mg twice daily.  (*Id.*)  She noted a side effect of lack of memory but had no interest in further interventions at that time.  (*Id.*)  A physical and neurological examination was normal except for 2/4 deep tendon reflexes in both upper and lower extremities bilaterally.  (Tr. 277-79.)  Dr. Muthusamy diagnosed Ms. Jashurek with intractable epilepsy, unspecified type, noted she was stable on her current medication, and recommended a brain MRI with gadolinium.  (Tr. 279.)  Ms. Jashurek was cleared to drive as she had been seizure-free for at least six months.  (*Id.*)

Ms. Jashurek returned to see Dr. Muthusamy on December 16, 2021.  (Tr. 287-92.)  Dr. Muthusamy reviewed a recent MRI, which showed no evidence of intracranial process, mass, pathologic enhancement, or focal structural abnormality to suggest malformation of cortical development.  (Tr. 287.)  Ms. Jashurek had not had a seizure since September 2020.  (*Id.*)  A physical and neurological examination was unchanged from March 2021.  (Tr. 290-91.)  Dr. Muthusamy continued Keppra 500 mg twice a day, ordered a check of Ms. Jashurek's Keppra level, and recommended a routine electroencephalogram ("EEG").  (Tr. 292.)

On January 13, 2022, Ms. Jashurek called Dr. Muthusamy's office to say she had a seizure the previous day; she asked if Dr. Muthusamy would like to see her sooner than her scheduled appointment on June 16, 2022.  (Tr. 310.)  Dr. Muthusamy instructed staff to ask Ms. Jashurek to come in on January 14 at 3:00 p.m., but Ms. Jashurek could not be reached until around 1:00 p.m. that day and said she was "working" and could not make it by 3:00 p.m.  (*Id.*) Dr. Muthusamy instructed staff to schedule Ms. Jashurek for the next week.  (*Id.* at 310-11.)

On February 3, 2022, Ms. Jashurek attended a virtual visit with Dr. Muthusamy.  (Tr. 303-07.)  She reported that she had episodes of jerking throughout the night on most nights.  (Tr. 304.)  Her last seizure was on January 12, 2022.  (*Id.*)  It was unprovoked and involved eye rolling, generalized shaking, falling to the floor, tongue biting, urinary incontinence, and loss of consciousness for more than five minutes.  (*Id.*)  Due to the breakthrough seizure, Dr. Muthusamy increased Ms. Jashurek's Keppra dose to 1000 mg twice a day, ordered a complete metabolic panel, and recommended an ambulatory EEG due to the myoclonic jerking while sleeping.  (Tr. 307.)  She also advised Ms. Jashurek to seek treatment for sleep apnea.  (*Id.*)  On March 1, 2022, Dr. Muthusamy ordered the ambulatory EEG.  (Tr. 454.)

Ms. Jashurek next saw Dr. Muthusamy on August 18, 2022.  (Tr. 434-39.)  She reported that she no longer had myoclonic jerking while sleeping, and that she had not had a seizure since January 2022.  (Tr. 435.)  A physical and neurological examination was normal except for less than fully intact deep tendon reflexes.  (Tr. 438-39.)  Dr. Muthusamy found Ms. Jashurek's epilepsy to be stable on Keppra 1000 mg twice a day and recommended putting off the ambulatory EEG since the night jerking had stopped.  (Tr. 439.)

On February 20, 2023, Ms. Jashurek returned to see Dr. Muthusamy.  (Tr. 560-64.)  She again reported that she experienced episodes of jerking throughout the night on most nights, with

4

sleep apnea and interrupted sleep.  (Tr. 560.)  She had not had any seizures since January 2022.
(*Id.*)  She was driving, since her last seizure was more than six months prior.  (*Id.*)  A physical
and neurological examination was normal with the exception of less than fully intact deep tendon
reflexes.  (*Id.*)  Dr. Muthusamy continued Keppra 1000 mg twice a day and recommended a
sleep study with EEG to investigate the episodes of jerking at night.  (Tr. 564.)

> ### ii.  Late-Submitted Records That Predate the August 2023 ALJ Decision

On May 3, 2023, Ms. Jashurek attended an initial intake interview at the Cleveland Clinic
Epilepsy Center.  (ECF Doc. 7-1, pp. 343-45.)  She reported the onset of grand-mal seizures in
2020, with the most recent occurring "yesterday – usually monthly."  (*Id.* at p. 344.)  Her current
medications were listed as Keppra and Depakote.  (*Id.*)  On that same date, based on a review of
Ms. Jashurek's records, Ann Warbel, APRN-CNP, and Imad Najm, M.D., recommended that she
participate in a long EEG and then consult with an epileptologist.  (*Id.* at pp. 334-35, 337-38.)

On July 10, 2023, Ms. Jashurek attended an initial neurological visit with Jocelyn
Bautista, M.D., at the Cleveland Clinic Neurologic Institute, Epilepsy Center, transferring care
because Dr. Muthusamy was leaving her practice.  (*Id.* at pp. 296-300, 315-20.)  Ms. Jashurek
reported a history of two seizures in 2020, after which she remained seizure free until January
2022.  (*Id.* at p. 316.)  She reported episodes of jerking throughout the night in February 2022,
and Keppra was increased to 1000 mg twice per day.  (*Id.*)  Her next reported seizure occurred in
March 2023, after which Keppra was increased to 1500 mg twice per day.  (*Id.*)  After another
seizure in May 2023, Lamotrigine was added to her medications.  (*Id.*)  Her husband also
reported that she "'trembles' at night, for a long time, almost every night."  (*Id.*)  Her
neurological examination findings were normal.  (*Id.* at p. 319.)  Dr. Bautista suspected focal
epilepsy, but with an unclear etiology and no clear risk factors.  (*Id.* at p. 320.)  She referred Ms.
Jashurek for a 3T temporal lobe protocol MRI of the brain to evaluate for epileptogenic lesions

and an inpatient video-EEG to confirm the diagnosis, evaluate the seizure burden, and attempt to record the jerking episodes in her sleep.  (*Id.*)  Ms. Jashurek was referred to the sleep clinic for obstructive sleep apnea and instructed to take seizure medications as directed and not drive.  (*Id.*)

Ms. Jashurek was admitted to the Cleveland Clinic Epilepsy Monitoring Unit ("EMU") on July 29, 2023, for a 3T temporal lobe protocol MRI of the brain and an inpatient video-EEG. (*Id.* at 212-20.)  Admission notes indicate that a PSG in May 2023 had showed epileptiform activity with post ictal confusion.  (*Id.* at p. 212.)  Ms. Jashurek's "current seizure types" were listed as: (1) "[c]onvulsions," 1-2/year, with the most recent seizures in 1/22, 3/23, and 5/23; and (2) "[j]erking in sleep," nearly every night.  (*Id.* at p. 213.)  Her general and neurological exam findings were normal.  (*Id.* at p. 217.)  Her seizure medications were stopped upon admission. (*Id.* at p. 220.)  Her stated goal on admission was to find out why her seizures started and how to have better control over them.  (*Id.* p. 239.)

Ms. Jashurek's July 29, 2023 brain MRI was normal (*id.* at 259, 287-88), but her video-EEG monitoring on July 31 reflected "[f]requent right temporal sharp waves" and "[t]wo seizures recorded, regional right temporal."  (*Id.* at p. 234.)  Her video-EEG monitoring on August 1 refers to one or more epileptic seizures in the right fronto-temporal region, including a generalized tonic-clonic seizure.  (*Id.* at pp. 91-92.)  An inpatient magnetoencephalography ("MEG") on August 1 showed a few inter-ictal epileptic dipoles in the right medial/basal temporal and around the superior temporal sulcus.  (*Id.* at pp. 67-68, 95-96.)  Provider notes indicate that the right fronto-temporal discharges frequently seen during the VEEG evaluation were sleep activated, and that their frequency reduced significantly once Levetiracetam was restarted on July 31.  (*Id.*)  A positron emission tomography ("PET") on August 2 showed evidence of cortical dysfunction in the left temporal region and mild diffuse encephalopathy, but

no epileptiform discharges or EEG seizures. (*Id.* at pp. 61-62, 89-90.) No abnormality was identified to suggest a cause or consequence of seizure. (*Id.* at pp. 86-87.) Ms. Jashurek was discharged on August 2, 2023, with instructions to follow up with Dr. Bautista. (*Id.* at p. 207, 222.) Upon discharge, her Lamotrigine dosage was increased from 100 to 200 mg, with a 14-day bridge of Clonazepam during the increase; her Keppra was maintained at 1500 mg. (*Id.* at p. 207, 221.) A follow-up appointment was scheduled for September 6, 2023, so Dr. Bautista could first meet with the team in a patient management conference ("PMC"). (*Id.* at pp. 40-41.)

### iii.     Late-Submitted Evidence That Postdates August 2023 ALJ Decision

An EEG Video Evaluation Report based on the July 29 to August 2, 2023 admission was completed by Dr. Bautista on September 6, 2023. (ECF Doc. 7-1, pp. 37-38.) She indicated the video EEG was notable for interictal right frontotemporal sharp waves and right frontotemporal EEG patterns with EEG onset 5 to 30 seconds prior to clinical onset, with three seizures recorded. (*Id.* at p. 38.) The MRI was unremarkable, the PET showed mild hypometabolism in the right anteromesial temporal region, and the MEG showed a few discharges in the right medial/basal temporal and right STS. (*Id.*) The group felt there was evidence for right temporo-anterior perisylvian epilepsy, nonlesional, and recommended a right-sided stereo-EEG. (*Id.*)

Ms. Jashurek attended a virtual office visit with Dr. Bautista on September 6, 2023. (*Id.* at pp. 7-13, 21-27.) Dr. Bautista noted that Ms. Jashurek was seen in the sleep clinic on August 10, but was not interested in trying a PAP again and was referred to dentistry. (*Id.* at p. 22.) Her endocrinologist had recently prescribed a new medication for hypothyroidism. (*Id.*) Dr. Bautista discussed the recommendation for a SEEG with Ms. Jashurek, who indicated this was the first time she remembered hearing about epilepsy surgery; she was interested in meeting with a neurosurgeon to hear more about the risks and benefits of SEEG. (*Id.* at pp. 22, 27.) Her

7

antiepilepsy medications were continued and she was referred for a neurosurgery consult for a right-sided SEEG and instructed to follow up with Dr. Bautista in four months.  (*Id.* at p. 27.)

On September 8, 2023, Ms. Jashurek contacted Dr. Bautista's office to indicate that she no longer wished to have a neurosurgical consult or proceed with the PMC recommendations. (*Id.* at p. 3.)  She also declined to schedule a four month follow up with Dr. Bautista, and advised that she would reach out if she changed her mind or wished to schedule further consults.  (*Id.*)

### 2.    Opinion Evidence

#### i.    State Agency Medical Consultants

On July 15, 2022, state agency medical consultant Mehr Siddiqui, M.D., reviewed the record and found that epilepsy was one of several severe impairments.  (Tr. 67.)  He did not consider whether it met or medically equaled the relevant Listing at Step Three of the sequential evaluation.  (Tr. 67-68.)  He opined that Ms. Jashurek had the following Residual Functional Capacity ("RFC"): no exertional limitations; never climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; and avoid exposure to hazards such as hazardous machinery, unprotected heights, and commercial driving.  (Tr. 69-70.)

On reconsideration on November 11, 2022, state agency medical consultant Gerald Klyop affirmed Dr. Siddiqui's findings except that he further limited Ms. Jashurek to occasional crouching.  (Tr. 78.)  He considered whether Ms. Jashurek's epilepsy met Listing 11.02, finding it did not.  (Tr. 77.)

### C.    Function Report

Ms. Jashurek completed an Adult Function Report on January 15, 2022.  (Tr. 177-86.) She lived in a house with her spouse.  (Tr. 177.)  She was prevented from working by the following conditions: HAE, which caused pain and swelling in her hands, stomach, and feet that

could last for days; and seizures.  (*Id.*)  She also had sleep apnea, which affected her sleep.  (Tr. 178.)  Before the onset of her conditions, she was able to work and "live a normal life."  (*Id.*)

On a typical day, Ms. Jashurek woke up, drank coffee, watched television, cleaned up the house, had her husband or mother drive her to the store if needed, read, watched television again, made dinner, and went to bed.  (Tr. 178.)  She did not care for any other people or animals, and she had no problems with personal care or hygiene.  (*Id.*)  She did not need special reminders to care for her personal needs and grooming or to take medication.  (Tr. 181.)  She prepared "all kinds of meals" daily, and it usually took no more than 30 minutes.  (*Id.*)  She could garden by hand, clean, do laundry, and make simple household repairs.  (*Id.*)  She could not mow or "weed eat" because the vibrations aggravated her HAE and caused swelling.  (*Id.*)

Ms. Jashurek went outside daily, either walking or riding in the car.  (Tr. 182.)  She did not drive and could not go out alone because she never knew when she could have a seizure.  (*Id.*)  She went shopping for gifts and household items in stores and on the computer.  (*Id.*)  It did not take her more than an hour.  (*Id.*)  Her ability to handle money was not affected by her conditions.  (*Id.*)  She was able to pay bills, count change, handle a savings account, and use a checkbook/money order.  (*Id.*)

Ms. Jashurek's hobbies and interests included reading, watching television, and playing cards.  (Tr. 183.)  She did these things weekly and could do them "fairly well."  (*Id.*)  She had to be careful not to have a seizure while standing.  (*Id.*)  She spent time with others in person, on the phone, and by texting.  (*Id.*)  She engaged with others by socializing, playing games, having a campfire, or having dinner as often as possible.  (*Id.*)  She regularly went to the Eagles Social Club or visited friends.  (*Id.*)  She did not need to be reminded to go places, but she did need

someone to accompany her because she could not drive or be left alone. (*Id.*) The only changes in her social activities since the onset of her conditions was that she could not be left alone. (*Id.*)

Ms. Jashurek was limited in her abilities to stand, walk, sit, climb stairs, remember, and concentrate. (Tr. 184.) If she stood or walked for too long, it caused pain in her arms. (*Id.*) During HAE attacks, the pain was so severe she could not walk or stand. (*Id.*) During a seizure, she had no control of her entire body. (*Id.*) She could walk a few blocks before needing to stop and rest for ten minutes. (*Id.*) She could pay attention as long as needed, and she finished what she started. (*Id.*) She followed written instructions well and spoken instructions very well. (*Id.*) She had no problems getting along with authority figures, and she had never been laid off from a job because of problems getting along with others. (*Id.*) She did not handle stress well, as it caused HAE attacks and seizures. (Tr. 185.) She sometimes did not handle changes in routine well but had not noticed unusual behaviors or fears. (*Id.*)

Ms. Jashurek was right-handed (Tr. 184) and wore glasses/contact lenses (Tr. 185). To treat her conditions, she took: Keppra, which caused memory fog; Fluoxetine, which made her tired; and Firazyr, which caused bruises, itching, and swelling at the injection site. (Tr. 186.)

## D.    Hearing Testimony

### 1.    Plaintiff's Testimony

At the hearing on June 14, 2023, Ms. Jashurek appeared pro se and testified in response to questions from the ALJ. (Tr. 45-64.) She testified that she had been disabled and unable to work since December 12, 2021. (Tr. 47.) She chose that date because she was laid-off from her job during the COVID-19 pandemic and had developed epilepsy. (*Id.*) Returning to work was so stressful that she worried it would cause a seizure, so she left. (Tr. 47-48.) She and her

husband agreed it would be safer if she stayed home because she was not allowed to drive for six months after having a seizure.  (Tr. 48.)

Ms. Jashurek testified that she last had a seizure on May 1, 2023.  (*Id.*)  Before that she had one on March 16, 2023.  (*Id.*)  In March, her husband had found her on the floor.  In May, the seizure occurred during an EEG ordered by her neurologist.  (*Id.*)  She had another EEG scheduled for the month following the hearing.  (Tr. 56.)

Besides epilepsy, Ms. Jashurek's biggest issue was HAE.  (Tr. 54.)  HAE affected her ability to work because she could not walk when she had swelling in her feet and arms, and she could not move when she had swelling in her abdominal walls.  (*Id.*)  Ms. Jahurek treated herself with injections and infusions at home and also had emergency treatment.  (*Id.*)  She regularly saw Dr. Richard Lavi to follow her HAE.  (Tr. 55.)

Ms. Jashurek also dealt with asthma, anxiety and depression, sleep apnea, and GERD, and she wore contacts and glasses to treat low vision.  (Tr. 56.)  She lived with her husband and could do basic household chores.  (Tr. 58.)

### 2.     Vocational Expert's Testimony

A Vocational Expert ("VE") testified that a hypothetical individual of Plaintiff's age, education, and work experience, with the functional limitations described in the ALJ's RFC determination, could perform Plaintiff's prior work as a waitress but could not perform her prior work as a spray painter.  (Tr. 60-61.)  The hypothetical individual could also perform other representative positions in the national economy, including cleaner/housekeeper, cashier II, and inspector/hand packager.  (*Id.*)  If the person would be absent one day per quarter, the VE said it would be "well within the acceptable range of absenteeism for most employers."  (Tr. 61.)

### III.     Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.    If the claimant is doing substantial gainful activity, he is not disabled.

2.    If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.    If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.    If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.    If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140–42 (1987).  Under this

sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters*

*v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform other work available in the national economy.  *Id.*

### IV.     The ALJ's Decision

In his August 8, 2023 decision, the ALJ made the following findings:[2]

1.   The claimant meets the insured status requirements of the Social Security
     Act through December 31, 2025.  (Tr. 26.)

2.   The claimant has not engaged in substantial gainful activity since
     December 12, 2021, the alleged onset date.  (*Id.*)

3.   The claimant has the following severe impairments: epilepsy, hereditary
     angioedema, hypertension, and sleep apnea.  (Tr. 27.)

4.   The claimant does not have an impairment or combination of impairments
     that meets or medically equals the severity of the listed impairments in 20
     C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 29.)

5.   The claimant has the residual functional capacity to perform a full range of
     work at all exertional levels except: The claimant is limited to never
     climbing ladders, ropes, or scaffolds, frequently balancing, stooping,
     kneeling, and crawling, and occasionally crouching. The claimant should
     avoid all work at unprotected heights and around or operating hazardous
     moving machinery (e.g., power saws and jack hammers).  The claimant
     should never do commercial driving.  (Tr. 30.)

6.   The claimant is able to perform past relevant work as a waitress.  (Tr. 36.)

7.   The claimant was born in 1975 and was 46 years old, defined as a younger
     individual age 18-49, on the alleged disability onset date.  (*Id.*)

8.   The claimant has at least a high school education.  (*Id.*)

9.   Transferability of job skills is not material to the determination of
     disability.  (*Id.*)

---

[2] The ALJ's findings are summarized.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform, including cleaner/housekeep, cashier II, and inspector hand packager. (Tr. 36-37.)

Based on the foregoing, the ALJ determined that Plaintiff had not been under a disability, as defined in the Social Security Act, from December 12, 2021, through the date of the decision on August 8, 2023. (Tr. 37.)

## V. Plaintiff's Arguments

In her sole assignment of error, Plaintiff argues this case should be remanded pursuant to sentence six of 42 U.S.C. § 405(g) for consideration of newly submitted medical records related to her severe impairment of epilepsy. (ECF Doc. 11-1.)

## VI. Law & Analysis

### A. Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030

(6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'"  *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

## A.    Sole Assignment of Error: Plaintiff's Late-Submitted Epilepsy Treatment Records Constitute New and Material Evidence that Warrants a Sentence Six Remand

In her sole assignment of error, Ms. Jashurek argues that remand is appropriate under sentence six of 42 U.S.C. § 405(g) so that the Commissioner can review her application in light

of additional evidence that was not before the ALJ, which she attached to her brief.  (ECF Doc. 7-1).  (*See* ECF Doc. 10; ECF Doc. 11-1, pp. 9-15.)  She explains that she was not represented at her hearing, but that she later retained a representative who discovered "several material medical records were missing from the record."  (ECF Doc. 11-1, p. 1.)   In response, the Commissioner argues that a sentence six remand is not warranted because there is no reasonable probability that the new evidence would have changed the outcome of the case.  (ECF Doc. 9.)

"[W]here the Appeals Council considers new evidence but declines to review a claimant's application for disability insurance benefits on the merits," the Sixth Circuit has explained that "the district court cannot consider that new evidence in deciding whether to uphold, modify, or reverse the ALJ's decision."  *Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996).  The district court can, however, consider the same new evidence as the basis for a sentence six remand.[3]  *Cline*, 96 F.3d at 148.  Because Ms. Jashurek did not submit the relevant records to the Appeals Council until after the ALJ's August 8, 2023 decision, those records can only be considered in the context of a sentence six remand.

To justify remand under sentence six, Ms. Jashurek must show that the evidence she now presents in support of a remand is new and material, and that there was "good cause" for her failure to present this evidence in the prior proceedings.  *See Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 483 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)); *see also Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276-278 (6th Cir. 2010).  Evidence is new "only if it was not in existence or available to the claimant at the time of the administrative proceeding."  *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted).  Evidence is material "only if there is a

---

[3] There are two kinds of remand under Section 405(g): a "sentence four remand" made in connection with a judgment affirming, modifying, or reversing the commissioner's decision; and a "sentence six remand" where the court makes no substantive ruling as to the correctness of the Commissioner's decision.  *See Melkonyan v. Sullivan*, 501 U.S. 89, 97–101 (1991).

reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Id.* (internal quotations and citations omitted). "A claimant shows good cause by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Id.* (internal quotations and citations omitted).

The Commissioner challenges only one of the three elements, arguing that sentence six remand is not warranted because Ms. Jashurek has not shown that the late-submitted treatment records are "material." (ECF Doc. 9, pp. 6-10.) Nevertheless, Ms. Jashurek bears the burden of showing that all elements supporting a sentence six remand have been met. *See Foster*, 279 F.3d at 357. The undersigned will therefore address the two unchallenged elements—whether the evidence is "new" and whether Ms. Jashurek had "good cause" for failing to present the evidence in the prior proceeding—before considering whether the records are "material."

### 1.    The Evidence is New and Remand is Supported by Good Cause

First, Plaintiff asserts that the late-submitted treatment records are "new" because "most of the records were not in existence at the time of her June 14, 2023 hearing." (ECF Doc. 11-1, p. 10.) The Commissioner does not disagree, also characterizing the evidence as "new." (ECF Doc. 9, pp. 6, 7.) While the late-submitted treatment records include one treatment visit that precedes the June 2023 hearing (ECF Doc. 7-1, pp. 343-45), the remainder of the records relate to treatment Ms. Jashurek received after the hearing (ECF Doc. 7-1), although most of the treatment records also precede ALJ's August 2023 decision (*id.* at pp. 58-329).

The Sixth Circuit explains that evidence is new if it was "not in existence or available to the claimant at the time of the administrative proceeding." *Ferguson*, 628 F.3d at 276. Consistent with Plaintiff's unrepresented status, the medical evidence in the administrative record before the ALJ was collected by the agency, not Ms. Jashurek. (*See* Tr. 225-617.) Ms.

Jashurek advised the agency before her hearing that she continued to undergo treatment (Tr. 219) and testified at the hearing that she had recent seizures in March and May (Tr. 48) and that she was going to the Cleveland Clinic the following month for a two-hour EEG (Tr. 56).  While the ALJ arranged for the medical records in evidence to be sent to Ms. Jashurek to review after the hearing, the ALJ only advised Ms. Jashurek that she could request a new hearing after reviewing the records, not that she could ask the agency to collect updated records.  (*See* Tr. 63-64 ("Because you're not represented, you have the right and the obligation to be able to look at your records to know whether or not we have everything, okay.  And if you feel that there is, you know, from those records you – you think that you should have another hearing, then you have to let us know within ten days of receiving those records that you want another hearing, okay?").)

Considering the dates of the relevant treatment, Ms. Jashurek's unrepresented status at the time, and the other information discussed above, the undersigned concludes that the record supports a finding that the records were "new" because they were "not in existence or available to the claimant at the time of the administrative proceeding."  *Ferguson*, 628 F.3d at 276.

Second, Ms. Jashurek asserts that she had "good cause" for not submitting the updated treatment records before the ALJ issued her written decision because:

> i) she appeared *pro se* at the hearing; ii) the evidence at issue was either unavailable because it did not exist or because Plaintiff did not know she was responsible for submitting same; iii) Plaintiff has memory loss secondary to epilepsy; and iv) the ALJ did not ask Plaintiff whether there was additional evidence to submit or disclose as was required by HALLEX I-2-6-78[.]

(ECF Doc. 11-1, pp. 13-14.)  The Commissioner does not address the issue of good cause.  (*See* ECF Doc. 9.)  Good cause may be shown "by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ."  *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted).  Here, the record reflects that Ms. Jashurek was unrepresented at the time of her hearing (Tr. 46), that she advised the

18

agency and the ALJ of additional seizures and medical treatment postdating the medical records in evidence (Tr. 48, 56, 219), and that she was not advised at the hearing that she had the right to ask the agency to collect additional medical records (Tr. 63-64).[4] After she later retained counsel, Plaintiff's counsel did take prompt steps to provide the updated records. (Tr. 224.) In this context, the undersigned concludes that Ms. Jashurek has demonstrated "good cause" by providing "a reasonable justification for [her] failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Ferguson*, 628 F.3d at 276.

### 2. The Evidence is Material

Having found that the treatment records are "new" and that Plaintiff has shown "good cause" for failing to submit the records prior to the ALJ's written decision, the undersigned turns to the final element—whether the updated treatment records are "material." Evidence is material "only if there is a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Ferguson*, 628 F.3d at 276 (internal quotations and citations omitted). Here, the Appeals Council determined on October 18, 2024, that new treatment records dating through August 8, 2023, did "not show a reasonable probability that it would change the outcome of the decision," and that records dated after August 8 did "not relate to the period at issue" and therefore did "not affect the decision about whether [Plaintiff] w[as] disabled beginning on or before August 8, 2023." (Tr. 1-2.)

In support of remand, Ms. Jashuek argues that the medical records before the ALJ "described a patient with a normal EEG indicating no seizure activity who was considered stable and permitted to drive a car," while the late-submitted records "indicate a progressive worsening of Plaintiff's epilepsy in the months leading up to the issuance of the ALJ's August 2023

---

[4] It does appear, however, that the agency sent written correspondence on June 21, 2023, that advised Ms. Jashurek that she had the right to submit any additional records that she wanted the ALJ to consider. (Tr. 222-23.)

decision." (ECF Doc. 11-1, p. 12 (citations omitted).)  In support, she highlights new treatment notes and objective findings, including evidence of breakthrough seizures, new and increased antiepileptic medications, abnormal EEG, PET, and MEG results, and a recommended frontal lobe procedure.  (*Id.*)  Based on this evidence and repeated reports that she was jerking nightly in her sleep, Ms. Jashurek argues there was a reasonable probability that the ALJ would have rendered a different decision in her Step Three listings analysis or in her evaluation of Ms. Jashurek's subjective symptom reports at Step Four.  (*Id.* at pp. 12-13; ECF Doc. 10.)

The Commissioner argues that the new evidence is insufficient to satisfy the requirements of Listing 11.02 or support a finding of medical equivalency at Step Three, and that it is also "cumulative of what was already in the record" with respect to the RFC analysis at Step Four. (ECF Doc. 9, p. 7-10.)  Ms. Jashurek responds that the additional objective findings contained in the new records "could very well alter the ALJ's assessment of Plaintiff's symptom allegations ... because 'objective medical evidence is a useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms, including the effects those symptoms may have on the ability to perform work related activities.'" (ECF Doc. 10, pp. 2-3 (quoting SSR 16-3p, *Evaluation of Symptoms in Disability Claims*, 82 Fed. Reg. 49462 (Oct. 25, 2017)).)

A review of the ALJ's written decision reveals that she made the following findings and observations with respect to Ms. Jashurek's epilepsy and subjective symptom reports:

- Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record," in particular because her "*allegations are out of proportion to the medical evidence and other evidence*" (Tr. 31 (emphasis added));

- Her epilepsy was stable at 500 mg of Keppra twice per day in December 2021 (*id.*);

- She reported a seizure in January 2022 but could not immediately attend a treatment visit because she was "working" (*id.*);

- A February 2022 EEG was normal (*id.*);

20

- She reported episodes of jerking through the night in February 2022, and her Keppra was increased to 1000 mg twice per day (*id.*);

- Her epilepsy was stable at 1000 mg of Keppra twice per day in August 2022, and she reported that she was no longer having myoclonic jerking while sleeping (Tr. 32, 34);

- She again "reported episodes of jerking throughout the night most nights" in February 2023, and her doctor continued her on 1000 mg of Keppra twice per day and recommended a sleep study with EEG (Tr. 33, 34);

- Although her doctor recommended a sleep study with EEG "*it does not appear that the claimant attended a sleep study with EEG*" (Tr. 34 (emphasis added));

- While she received medical care on a regular basis, she did not require or receive frequent care for any medically determinable impairment (*id.*);

- "[F]rom August 2020 to June 14, 2023 (the date of the hearing), the claimant has had only five seizures and there is no evidence of significant injuries sustained during any seizure" (Tr. 35).

Thus, the ALJ based her decision in part on a finding that Ms. Jashurek's subjective allegations were "out of proportion to the medical evidence and other evidence" (Tr. 31) and observations that Ms. Jashurek's epilepsy was stable (Tr. 31, 32, 34), which was described as "[s]ignificant[]" (Tr. 34), that the initial reported episodes of jerking in the night resolved following a medication adjustment (Tr. 32, 34), that Ms. Jashurek had a normal EEG (Tr. 31), and that she did not appear to have attended "a sleep study with EEG" as recommended by her doctor (Tr. 33, 34).

A review of the late-submitted evidence reveals the following additional information:

- Ms. Jashurek's antiepileptic medications were increased to 1500 mg of Keppra twice per day after a March 2023 seizure (ECF Doc. 7-1, p. 316);

- Despite that increase, she had another seizure in May 2023 and Lamotrigine was added to her antiepileptic medications (*id.*);

- Despite those medication increases, her husband continued to report that she "'trembles' at night, for a long time, almost every night" (*id.*);

- She was referred for an inpatient video-EEG in July 2023, for the purposes of confirming her diagnosis, evaluating her seizure burden, and attempting to record the jerking episodes in her sleep (*id.* at p. 320);

21

- She was admitted to the EMU for five days in July and August 2023 for a brain MRI and inpatient video-EEG, with two listed seizure types: convulsions and jerking in sleep (*id.* at pp. 212-20);

- While her medications were stopped for video-EEG monitoring, frequent right fronto-temporal discharges were determined to be sleep activated and three seizures were recorded (*id.* at pp. 38, 67-68, 91-92, 95-96, 234);

- Her video-EEG, MEG, and PET testing revealed abnormal findings (*id.* at 38, 61-62, 67-68, 89-90, 91-92, 95-96, 234);

- At the conclusion of her EMU admission, her Lamotrigine dosage was increased from 100 mg to 200 mg (*id.* at pp. 207, 221);

- The neurological team who reviewed the findings from her EMU admission felt there was evidence of right temporo-anterior perisylvian epilepsy and recommended a right-sided stereo-EEG (*id.* at p. 38).

Following a review of the ALJ's written decision—including her finding that a medical record characterizing Plaintiff's epilepsy as "stable" was "[s]ignificant[]", her observation that Ms. Jashurek did not appear to have attended a recommended sleep study with EEG, and her overall finding that Ms. Jashurek's subjective allegations were "out of proportion to the medical evidence and other evidence"—the undersigned concludes that "there is a reasonable probability that the [ALJ] would have reached a different disposition of the disability claim if presented with" the late-submitted treatment records that are now before this Court. *See Ferguson*, 628 F.3d at 276. Contrary to the ALJ's statements, the late-submitted evidence demonstrates that Plaintiff had multiple breakthrough seizures despite increases in her antiepileptic medications, that she followed provider instructions to undergo additional testing—including a five-day EMU admission, and that objective medical test findings substantiated a specific epilepsy diagnosis and supported increasingly significant treatment recommendations. Accordingly, the undersigned concludes that the late-submitted treatment records are "material."

In making this finding, the undersigned does not draw any conclusions as to what the ALJ will ultimately find with regard to the additional treatment records. The ALJ must make her

22

own determination in the first instance as to the impact of those records on her subjective symptom analysis.  The conclusion reached herein is simply that the relevant evidence is material to the disability determination, and should be considered by the ALJ on remand.

For the reasons set forth above, the undersigned finds merit to Plaintiff's sole assignment of error and recommends that the Court remand this matter pursuant to sentence six of § 405(g) for further proceedings and reconsideration of the evidence in light of the updated treatment records.  (ECF Doc. 7-1.)

### VII.   Recommendation

For the foregoing reasons, the undersigned recommends that the Court **REMAND** this matter pursuant to sentence six of § 405(g) for further proceedings and reconsideration of the evidence in light of the updated treatment records (ECF Doc. 7-1) and administratively close the case subject to reopening upon motion of the parties.


November 25, 2025

/s/Amanda M. Knapp
AMANDA M. KNAPP
United States Magistrate Judge



### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).